UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

SARA MAE BOMMICINO,

       Plaintiff,

v.                                          Case No. 3:19-cv-486-J-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

       Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her application for a period of disability and disability insurance benefits ("DIB"). Following an administrative hearing held by video on December 19, 2017, the assigned Administrative Law Judge ("ALJ") William Callahan issued a decision, finding Plaintiff not disabled from March 4, 2015, the alleged disability onset date, through April 30, 2018, the date of the ALJ's decision.[2] (Tr. 21-30, 35-66.) Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and REMANDED**.

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Docs. 15 & 18.)

[2] Plaintiff had to establish disability on or before December 31, 2020, her date last insured, in order to be entitled to a period of disability and DIB. (Tr. 21.)

## I.      Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.     Discussion

Plaintiff raises the following five issues on appeal:

[1.]    The ALJ violated SSR 00-4p by failing to resolve an apparent conflict between the [Vocational Expert's] testimony and the [Dictionary of Occupational Titles] ["DOT"].

2

[2.]    The ALJ erred in failing to accord adequate weight to the opinions of Ms. Bommicino's treating physicians.  Thus, the ALJ's [Residual Functional Capacity] ["RFC"] assessment is not supported by substantial evidence.

[3.]    The ALJ's credibility determination of Ms. Bommicino [sic] is contrary to law and is not supported by substantial evidence.

[4.]    Due to the ALJ's prejudice or bias, this case should be remanded to another ALJ.

[5.]    The ALJ erred in finding that Ms. Bommicino's bilateral hand pain to be a non-medically determinable impairment.

(Doc. 20 at 2.)   Defendant counters that substantial evidence supports the ALJ's decision that Plaintiff was not disabled, and that Plaintiff failed to establish bias. (Doc. 21.)  The undersigned agrees, in part, with Plaintiff on the second issue, and, therefore, does not address the remaining arguments in detail.

## A.    Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor."  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011).  Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise.  *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3)

treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, No. 8:06-cv-1863-T-27TGW, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability

4

evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[3] (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources).  While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision.  SSR 96-6p.

### B.    Relevant Evidence of Record

### 1.    Treatment Records

***Lyerly Neurosurgery***

On March 4, 2015, Plaintiff attended a consultation with Lyerly Neurosurgery in Jacksonville, Florida "at the request of Dr. Kenny Powell[4] for evaluation of her neck and left upper extremity pain as well as low back pain." (Tr. 310.)  The consultation note indicated, in part, as follows:

> The patient is a pleasant 50-year-old female who presents with a chief complaint of neck and left upper extremity pain over the past 4 months.  In addition to pain she has paresthesias.  Her pain is most pronounced in the left biceps.  She also has left scapular pain and describes a positive Spurling's maneuver.

---

[3] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017.  However, because Plaintiff's application predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

[4] Dr. Kenneth Powell was one of Plaintiff's treating doctors at Coastal Spine & Pain Center ("Coastal") in Jacksonville, Florida.  The earliest note from Dr. Powell in the record is dated August 26, 2014.  (Tr. 353.)  On January 13, 2015, Dr. Powell noted that Plaintiff had been referred to neurosurgeon Bradley Wallace, M.D., Ph.D. for possible surgery for her "neck pain with cervical radiculopathy [and] [t]horacic HNP [herniated nucleus pulposus] with thoracic radiculopathy."  (Tr. 338.)  Dr. Powell also noted, *inter alia*, that Plaintiff had "T11-12 left paracentral disc herniation and  [that] TESI [thoracic epidural steroid injections] ha[d] not been helpful."  (Tr. 339.)

> The patient's secondary complaint is of chronic low back pain.  The patient has undergone numerous modalities of treatment including chiropractic care, PT and pain management with Dr. Powell.  She has taken Neurontin, hydrocodone and Flexeril.  Her average pain score is a 6-7/10.  The patient is here requesting definitive management and evaluation.

(*Id.*)  The consultation report is incomplete as only page one of four is included in the record.  (*Id.*)

On April 6, 2015, Plaintiff presented to Dr. Wallace at Lyerly Neurosurgery for a follow-up status post C5 to C7 anterior cervical spine discectomy and fusion ("ACDF") performed on March 19, 2015.  (Tr. 311-12.) The follow-up note indicated that Plaintiff reported 5/10 posterior neck and shoulder pain.  (Tr. 312.) Plaintiff also reported "complete relief of her upper extremity pain with occasional left triceps pain."  (*Id.*)  Physical examination revealed, in part, that Plaintiff was not in acute distress, was neurologically stable, the surgical incision was clean, dry and approximated, there was no drainage and very minimal swelling.  (*Id.*) Plaintiff was "able to rotate the head left and right 65 degrees without discomfort," to "flex/extend the neck gently without discomfort," and had "full upper extremity range of motion with 5/5 power."  (*Id.*)  Physical examination also revealed: "Sensation is grossly intact.  . . .  Cranial nerves II-XII [were] grossly intact. Radial pulses [were] 2+/4 and equal bilaterally.  [Deep tendon reflexes] [were] 2/3 and equal in the bilateral upper extremities."  (*Id.*)  Dr. Wallace directed Plaintiff to maintain a ten-pound lifting restriction for six weeks after surgery and to return to the clinic for a 90-day post-operative follow-up visit.  (Tr. 311.)  Dr. Wallace

provided Plaintiff with a prescription for Percocet.  (*Id.*)

### Coastal Spine & Pain Center

The records from Coastal Spine & Pain Center are dated from August 26, 2014 through July 22, 2015.  (Tr. 319-59.)  However, it appears Plaintiff established care with Coastal as early as 2013.  (*See* Tr. 297-98 (MRI diagnostic results from June 21, 2013 listing Dr. Manuel Lopez, one of Plaintiff's treating doctors at Costal, as the ordering doctor).)  Before her ACDF surgery, Plaintiff participated in physical therapy at Coastal, but reported that it was "not helping much."  (Tr. 331.)  Plaintiff presented to Coastal on April 16, 2015 for pain in her neck, bilateral shoulders, arms and feet; she was examined by Christopher Manees, M.D.  (Tr. 326-27.)  Plaintiff reported a pain severity level of 5/10, which she described as "constant, sharp, dull, achy, burning, knife-like" and noted that her pain had not changed since her last visit, and the pain was 50% axial and 50% in the extremity.  (Tr. 326.)  General examination revealed, in part, bilateral L5 paresthesias.  (*Id.*)  Plaintiff's assessments were listed as cervical radiculitis; encounter for long-term (current) use of other medications; low back pain; lumbosacral radiculitis; and sacroiliitis/sacral dysfunction.  (Tr. 327.)  Plaintiff's treatment included pain medication and muscle relaxants, including Norco, Neurontin, Trazadone, and Flexeril.  (*Id.*)  Dr. Manees also noted Plaintiff reported taking the medications as prescribed without adverse effects.  (*Id.*)  Dr. Manees also listed bone stimulation, physical therapy, and follow-up with Dr. Wallace under "treatment."  (*Id.*)  A urine/saliva drug screening was performed to

7

confirm compliance with the pain management program.  (*Id.*)

On May 18, 2015, Plaintiff presented to Coastal complaining of pain in the neck, shoulders, arms, and feet, bilaterally.  (Tr. 323.)  She also complained of "low back pain with radiation to the left lower extremity most consistent with a left L4 and S1 dermatomal distribution."  (*Id.*)  Plaintiff was examined by Scott N. Schimpff, M.D., who noted Plaintiff's urine screening was positive for hydrocodone, oxycodone, and benzodiazepines:

> She is recently status post C5-C7 fusion with Dr. Wallace. [Prescription Drug Monitoring Program] ["PDMP"] [was] reviewed - she filled [P]ercocet and [V]alium post-op from Dr. Wallace.  Our last [prescription] for [N]orco was not listed on PDMP.  Patient states that this is because she filled our last [N]orco [prescription] in Georgia. We discussed this at length.  She was instructed to fill all controlled substances in Florida moving forward.  She understands and agrees.

(Tr. 323.)  Plaintiff's assessments included lumbar radiculitis; encounter for long-term (current) use of other medications; low back pain; muscle spasm; displacement of lumbar intervertebral disc; lumbar spondyloarthritis/facet joint disease; cervical radiculitis; cervicalgia/neck pain; cervical disc herniation; post-laminectomy syndrome of cervical region, status post C5-C7 ACDF, late effects; insomnia; and anxiety.  (Tr. 324.)  Treatment notes for lumbosacral radiculitis listed Selective Nerve Root Block (SNRB) injections to be scheduled, and stated:

> Clinically, the patient is experiencing [] left L4 and S1 radiculopathy. Lumbar MRI confirms L3-S1 disc bulges with stenosis.  She is 6 weeks s/p [status post] C4-7 ACDF.  We will schedule for lumbar injection therapy.  Prior to proceeding, the patient will discuss with Dr. Wallace of spine surgery to discuss whether he is OK with proceeding with steroid administration at 6 weeks post-op fusion.

8

(*Id.*)  Dr. Schimpff also noted that Plaintiff had a urine screening "due to probability of drug interactions and side effects and possible noncompliance" but indicated that Plaintiff was being given a 30-day supply of pain medications, and that Plaintiff's condition was of a chronic nature and would "most likely need to continue pain med[ications] for an indefinite, but long [sic] period of time."  (Tr. 325.)  The treatment notes for low back pain also indicated that an LSO (lumbar sacral orthosis) brace had been previously requested, but Plaintiff had a "significant deductible.  We will re-submit request for auth[orization] for LSO." (*Id.*)  Dr. Schimpff also noted that Plaintiff would continue to take Valium for anxiety, but that it had not been prescribed by Coastal.  (*Id.*)

On June 17, 2015, Plaintiff was seen by Dr. Manuel Lopez at Coastal.  (Tr. 321-22; *see also* Tr. 299.)  Plaintiff complained of low back pain that radiated to her left leg and reported "a fall at home from a step stool [and] she felt her leg gave out on her."  (Tr. 321.)  Dr. Lopez noted that Plaintiff's urine screening from her last two visits were positive for Hydrocodone and Oxycodone products and "she had both due to recent surgery with Dr. Wallace."  (*Id.*)  Plaintiff reported a pain level of 6/10, which was described as "constant with intermittent exacerbations, sharp, dull, achy," and complained that her pain had worsened since her last visit in her neck and lower back, and the pain was 100% axial.  (*Id.*) Dr. Lopez assessed lumbosacral radiculitis; muscle spasm; encounter for long-term (current) use of other medications; and low back pain.  (*Id.*)  Dr. Lopez

9

ordered an MRI of Plaintiff's lumbar spine.  (Tr. 322.)  Dr. Lopez performed another urine screening per regulations and provided Plaintiff with a "28[-]day supply of medication as part of a comprehensive pain management treatment plan."  (*Id.*)  Dr. Lopez then noted that "FPDM shows she has filled medications from [Florida] and Georgia.  She recently got married and changed her name and [was] moving to [Georgia].  I oriented patient to stay within one state and that she cannot take 2 different short acting pain medications."  (*Id.*)

According to the last treatment note from Coastal, Plaintiff was seen by Dr. Lopez again on July 22, 2015.  (Tr. 319-20.)  Plaintiff complained of low back and hip pain that radiated to her lower extremities that had worsened since her last visit and rated her pain as 5/10.  (*Id.*)  Dr. Lopez reported that he had ordered an MRI due to Plaintiff's fall and worsening lower extremity pain, but it had been denied by insurance and Plaintiff was "self[-]pay due [to] apparent insurance issues."  (*Id.*)  He also noted that Plaintiff wanted to decrease Gabapentin as it was too strong.  (*Id.*)  Musculoskeletal examination revealed reproduction of pain with flexion, rotation, and extension and negative straight leg raises.  (*Id.*)  Neurologic exam revealed, in part, decreased sensation in the right and left lower extremities.  (*Id.*)  Plaintiff was assessed with lumbosacral radiculitis; encounter for long-term (current) use of other medications; low back pain; displacement of lumbar intervertebral disc; sacroiliitis/sacral dysfunction.  (*Id.*)  Plaintiff had a urine screening to confirm compliance with the pain management program and her pain medication regimen was continued.  (Tr. 320.)  Dr. Lopez also noted that

10

Plaintiff's "opioid medication history was checked using the state prescription drug monitoring system and [was] found to be concordant with the patient's reported medication history."  (*Id.*)

### Kaiser Permanente

After moving to Georgia, Plaintiff established medical treatment with Kaiser Permanente and was seen by various providers from approximately September 6, 2015 until February 24, 2016.  (Tr. 360-80, 387-432.)  Kaiser progress notes dated October 27, 2015, indicate that Plaintiff complained of pain in her hands, bilaterally, swelling in her fingers, and bilateral foot/heel pain.  (Tr. 365-67.) Progress notes from Noshin Najafi, M.D. revealed positive tenderness to palpitation over medial side of heels, bilaterally, and positive hypertrophy of pip joints in fingers, bilaterally.  (Tr. 367.)  Plaintiff underwent testing for rheumatoid arthritis, but the results were negative.  (Tr. 373.)   Kaiser treatment notes show that on February 10, 2016, Plaintiff was seen in the Rheumatology Department by Payal P. Suthar, D.O., who diagnosed Plaintiff with left trigger thumb and right trigger finger and administered a tendon sheath injection.  (Tr. 381.)

Also of note, a November 3, 2015 progress note from Ammar Divan, M.D. at the Gwinett Medical Office Center stated:

- Long-standing chronic pain [history], prior ACDF, multiple injections.  Will re-image the spine to evaluate for disease progression in the [cervical, thoracic, and lumbar] spine.
- Has been managed on hydrocodone since prior to [Kaiser Permanente].
- As a courtesy, I have provided [a] [prescription] for this month as well as next month.  It may be continued by her PCP under an

11

opioid agreement.
- Will obtain a USD [urine sample] today.
- Increase Gabapentin to 400 mg QID.
- Although interventional treatments may be an option for treating patient's pain, I recommend other conservative measures that should be tried first.  The patient has been referred for a course of physical therapy for the purpose of improving pain tolerance, range of motion, and overall function.
- [Return] in 2 to 3 months for [physical therapy] follow up and an MRI review.

(Tr. 396-97.)   Progress notes from Dr. Divan dated February 24, 2016 indicated that Plaintiff presented for review of MRIs and reported that she "[d]id not start PT as it was too expensive for her.  She did incorporate PT exercises that she learned prior to her neck surgery."  (Tr. 413-14.)  Upon physical examination, Dr. Divan noted normal findings, but noted pain on bilateral lumbar facet loading.  (Tr. 415.)  Dr. Divan recommended Plaintiff try a limited number of physical therapy visits for her lower back pain.  (*Id.*)

### Dopson Family Medical Center/ Mark Hardin, D.O.

Plaintiff moved back to Florida and established care with Dr. Hardin at Dobson Family Medical Center on April 4, 2017.[5]  (Tr. 435.)  A Review of Systems by Dr. Hardin indicated that Plaintiff had cervical intervention (ACDF) which appeared "successful" as to Plaintiff's left upper extremity sensory compromise.  (Tr. 436.)  He also noted that Plaintiff had a history of motor vehicle

---

[5] It is unclear when Plaintiff moved back to Florida and there appears to be a gap in her medical records between February 2016, when she was last treated at Kaiser, and April 2017, when she established care with Dr. Hardin at Dopson Family Medical Center in Macclenny, Florida.

accidents in the past, had received epidural injections throughout the lumbar spine, her most recent treatment had been at Coastal, and she was now complaining of increased cervical pain, sleep disturbances, and seasonal allergies.  (*Id.*)  Dr. Hardin also found limitation of motion and tenderness in Plaintiff's neck, as well as a left knee infrapatellar trigger point.  (Tr. 436-37.)  Dr. Hardin referred Plaintiff to Dr. Andwaris for pain management.  (Tr. 438.)

On April 21, 2017, Plaintiff presented to Dr. Hardin complaining of back pain and foot pain (bilateral plantar aspect and right great toe) and requesting pain medication until she could be seen for her pain management appointment. (Tr. 439-43.)  Dr. Hardin noted findings of asymmetry and tenderness in Plaintiff's neck and assessed osteoarthritis of spine with radiculopathy, lumbar region; bilateral plantar fasciitis; arteriosclerotic vascular disease; and sleep disorder. (Tr. 441-42.)  Dr. Hardin provided Plaintiff with a limited prescription for Hydrocodone, ordered a series of diagnostic tests and X-rays, and referred Plaintiff to a gastroenterologist and podiatrist.  (Tr. 442.)

Plaintiff presented to Dr. Hardin on May 3, 2017 for follow-up of lab results. (Tr. 444-47.)  Physical exam findings were unremarkable.  (Tr. 445-47.)  Dr. Hardin assessed chronic obstructive pulmonary disease ("COPD"), unspecified; obesity; and degenerative joint disease, lumbosacral.  (Tr. 447.)  On May 25, 2017, Plaintiff presented to Dr. Hardin for prescription refills and medication modification.  (Tr. 448-51.)  Treatment notes indicate as follows:

[Patient] presents today for [] refills on all [prescriptions][.]  [Patient]

13

> also requesting that Gabapentin still be 400 mg PRN but [requested] 100 mg tabs [as] she states that sometimes 400 mg is just too much[.]  [Patient] is also requesting to discuss anxiety issues[.] [S]he states she has been previously diagnosed with anxiety issues and her symptoms are becoming worse lately[.]

(Tr. 448.)  Plaintiff also complained of fatigue, mood swings, stress caused by pain, and difficulty sleeping.  (Tr. 449.)  Plaintiff appeared comfortable and exam findings were unremarkable, including mental status (normal) and affect (normal). (Tr. 450.)  Dr. Hardin's assessment included osteoarthritis of the spine with radiculopathy in the lumbar region; mood swings; and a sleep disorder.  (Tr. 451.)  Dr. Hardin also made the following notations: "Trial – weaning off [Gabapentin] as [patient] [is] having lightheadedness, fatigue and [patient] [is] no longer having prominent [lower extremity] pain.  [Patient] to [discontinue] cyclobenzaprine.  Infrequent Xanax use.  [Patient] defers [Selective Serotonin Reuptake Inhibitor] ["SSRI"] [treatment] – not well tolerated in the past."  (Tr. 451.)  The notes indicate Dr. Hardin then added a new prescription for Alprazolam.  (*Id.*)

On October 5, 2017, Plaintiff presented to Dr. Hardin, complaining of numbness in both hands and tingling up her arms for two weeks and "requesting a Ventolin inhaler for shortness of breath, and [] [X]anax tid #90."  (Tr. 453.) Treatment notes indicated:

> Patient seen here for right forearm soreness[,] subsequent hand paresthesias median nerve distribution [for] 3-6 weeks without trauma.  Patient did note some ecchymosis and flexor forearm region with some swelling.  Hand function is 100% and without pain. Patient does have cervicalgia on a chronic basis.  She is status post

14

> epidural blocks in the lumbar region.  Patient also complaining of
> shortness of breath and anxiety—prescribed minidose and anxiolytic
> in the past—desiring refills.

(Tr. 453-54.)  Plaintiff complained of back pain and anxiety, but denied neurologic

symptoms, including abnormal gait.  (Tr. 454.)  Physical examination revealed

tenderness in the neck (C4-5), but negative findings were otherwise noted.  (*Id.*)

Dr. Hardin noted the following musculoskeletal details: "Ecchymosis noted in the

distal flexor forearm at the flexor digiti minimizing, platelet Paulick is longus

region.  Additionally[,] [a] trigger point is noted [in the] medial proximal ulnar

epicondyles.  Flexion and grip reproduces pain in this region.  There is no

edema.  Ulnar and radial pulses are +2/4."  (*Id.*)  Dr. Hardin assessed anxiety,

tendonitis, paresthesias in the right hand, and cervicalgia.  (*Id.*)  He further noted:

"Patient injected . . . proximal tendon of the flexor digiti metabolic and medial

ulnar bursa—tolerated well.  MDI [inhaler] refilled.  Anxiolytic therapy

discussed—refilled as well.  Home rehab[ilitation] instructions provided.  If

symptoms return [sic] cervical imaging with nerve conduction studies [of the] right

upper extremity."  (Tr. 454-55.)

On October 18, 2017, Plaintiff presented to Dr. Hardin for sinus problems

and a consultation and referral.  (Tr. 456-61.)  Plaintiff asked about "Disability

Paperwork and was told by attorney Frank Maloney that PCP would have this.

[sic] For a Dx [diagnosis], Prognosis and Treatment Plan."  (Tr. 457.)  In

conducting a review of systems, Dr. Hardin also noted, in part, the following:

**Musculoskeletal**: COMPLAINS OF: Back pain, [j]oint pain, [l]imited range of motion, [m]uscle aches, [s]tiffness[.]  DENIES: [j]oint swelling, [m]uscle weakness.

**Other musculoskeletal**[:]  Here in follow-up regarding degenerative joint disease of cervical[,] lumbar as well as thoracic spine.  Her imaging is appreciable for C5-6 HNP with spurring and bulging disc at C6-7, L5-S1 HNP with neuroforaminal encroachment as well as [T11-12] HNP.  Patient has post motor vehicle accident x2 prior to 2013 as referred post event imaging.  She has ongoing chronic cervicalgia with occipital onset headaches, intermittent upper extremity paresthesias as well as pain growing predominantly left side, daily low back pain with intermittent sciatica/radiculopathy to the foot.  Is under pain management and muscle relaxants and analgesics for [sic].  Neuropathic pain is partly [sic].  She received some benefit from analgesic topical therapy as well as very limited [Osteopathic Manipulative Treatment] ["OMT"] to thoracic region.  She is limited in her ability to lift[,] push[,] pull . . . .  Instructed not to lift over 15 pounds repetitively, she cannot remain on her feet for over 30 minutes without increasing low back pain and lower extremity radicular symptom progression.  She is maintaining motor strength with home rehab[ilitation].  Her lifestyle is compromised— contributory towards mood swings, sleep interruptions, and anxiety daytime frequency.  This point admitted back para [sic] T11 through L1 2 region[,] left greater than right with increased pain on attempted torso side bending or twisting maneuvers—not well tolerated.

(Tr. 459.)  Plaintiff denied neurologic symptoms, including abnormal gait, and psychiatric symptoms, including anxiety.  (*Id.*)  Upon physical examination, Dr. Hardin made the following findings with respect to Plaintiff's neck:

Limitations of motion (Range of motion: right rotation limited to 35° left rotation[,] 15° flexion[,] 40° extension less than 5°[.]  Palpable ropey paracervical musculature left greater than right with tight trapezius bilaterally.  Left scalene and levator scapulae ropey character with tightness as well.  Marked compromise right grip strength moderately compromised bilateral proximal musculature no motor loss.  Some sensory loss left upper extremity primarily ulnar distribution but including radial as well.  DTRs +2/4 bilateral upper extremities throughout.)

16

(Tr. 460.)  Dr. Hardin also reported the following musculoskeletal findings: "T9 left segmental posterior malposition.  Lumbar L3 through L5 also an [sic] malposition rotated left side bend left.  Lumbar flexion ability 80° without left SI and L5-S1 pain."  (*Id.*)  He assessed (1) DJD (degenerative joint disease); (2) osteoarthritis of the spine with radiculopathy, lumbar region; (3) osteoarthritis of thoracic spine with myelopathy; and (4) chronic nonintractable headache, unspecified.  (*Id.*)

Dr. Hardin then made the following notations:

Patient pain management with some optimal lifestyle as analgesic [sic] and physical medicine support cannot eliminate all symptoms. This patient's prognosis is guarded.  Disease in 3 regions which are expected to need further surgical intervention and hard to further compromise this patient's ambulatory and physical ability.  He [sic] has sleep [sic] or mood swings.  She cannot engage in employment as even clerical job description requires frequent stretching breaks, daily analgesic and muscle relaxant support.  She is receiving some benefit from epidural cervical blocks.  OMT is of limited value in 1 [sic] and beneficial only in the thoracic regions.  Muscle relaxant therapy is helpful [sic] for sleep maintenance alongside benzodiazepine use.  Eventual multi-pharmacy continued practice is also of concern.  Future neurosurgery reevaluation alongside supportive chronic pain treatment indicated.  Topical analgesic . . . reproach-lidocaine 5%.  All other medications maintain.

(*Id.*)

On November 13, 2017, Plaintiff presented to Dr. Hardin for follow-up of her right elbow pain, for which she previously received a trigger point injection. (Tr. 463.)  Plaintiff reported that the injection "helped a little but . . . has started back [and] she [was] unable at times to even grip her coffee cup."  (*Id.*)  A review of systems indicated: "She now reports with extensor forearm pain/discomfort lateral to the radius at the origin sites of extensor digiti minimi.  Disclaims

17

overuse or recent trauma to the involved extremity." (Tr. 464.) Plaintiff also complained of joint pain, limited range of motion, and muscle aches, but denied, *inter alia*, neurologic and psychiatric symptoms. (*Id.*) Upon physical examination, Dr. Hardin's findings included right radial extensor digiti minimi trigger point (extremities), tenderness, normal range of motion, and decreased muscle strength/tone (spine, ribs, pelvis). (Tr. 465.) Dr. Hardin assessed lateral epicondylitis of the right elbow, administered another trigger point injection, and referred Plaintiff to physical therapy. (*Id.*)

### *Premier Spine & Pain Center*

Upon referral from Dr. Hardin, Plaintiff began pain management treatment at Premier Spine & Pain Center ("Premier") on April 24, 2017 for neck pain, bilateral upper extremity pain, mid-back pain, low back pain, and bilateral lower extremity pain and was examined by Marisol Arcila, M.D. (Tr. 509.) Plaintiff reported her pain severity to be 5/10 on average and 10/10 at worst. (*Id.*) Physical examination revealed, in part, tenderness bilaterally in the sacroiliac ("SI") joints; negative Patrick's test bilaterally; negative straight leg raising and normal gait; decreased range of motion with flexion and extension and with lateral rotation in the cervical spine; normal lumbar spine; facet column tenderness on palpitation of the bilateral C3-4, C4-5, C5-6, bilateral L2-3, L3-4, L4-5, L5-S1; and positive facet loading test of the cervical and lumbar spine. (Tr. 510.) Dr. Arcila assessed cervicalgia; radiculopathy, cervical region; pain in the thoracic spine; low back pain; and radiculopathy, lumbar region. (*Id.*) Dr. Arcila

18

also noted that Plaintiff had "a legitimate painful medical condition that require[d] treatment with pain medication based on history, physical exam[,] and diagnostic testing." (Tr. 511.)  A urine drug screening panel appeared to show compliance with medication. (*Id.*)

On May 26, 2017, Plaintiff presented for a follow-up visit with Ashraf Andrawis, M.D. at Premier. (Tr. 507-08.)  Plaintiff reported pain severity ranging from 3/10 to 7/10 and reported symptoms of numbness, tingling and weakness of the bilateral upper and lower extremities. (Tr. 507.)  Dr. Andrawis noted Plaintiff was taking pain medication and was compliant. (*Id.*)  Plaintiff presented to Premier on June 26, 2017 and was treated by Hubert Matos, M.D. (T. 504-06.)  Plaintiff reported pain severity ranging from 4/10 to 7/10. (Tr. 504.)  Physical examination revealed findings consistent with Dr. Arcila's April 24, 2017 examination, as well as muscle spasm and tenderness of paravertebral muscles of the cervical, thoracic, and lumbar regions. (Tr. 505.)  On July 25, 2017, Dr. Andrawis examined Plaintiff, who reported a pain severity range between 5/10 and 7/10 with pain located in the neck, mid back, and low back. (Tr. 501-03.)  Findings upon physical examination were consistent with previous examinations. (Tr. 501-03.)  Dr. Andrawis ordered the scheduling of a lumbar epidural steroid injection in an effort to decrease pain and improve function, noting that Plaintiff "had tried and failed conservative therapy including physical therapy, home exercise and medication management[]." (Tr. 503.)

Plaintiff presented to Premier for back pain on August 22, 2017 and Dr.

Andrawis ordered an MRI of the lumbosacral spine.  (Tr. 498-500.)  On September 5, 2017, Dr. Matos reviewed the lumbar spine MRI results with Plaintiff, which revealed multilevel minimal discogenic disease and no significant canal stenosis.  (Tr. 496.)  Dr. Matos ordered an MRI of the cervical spine.  (*Id.*) Plaintiff reported pain severity ranging from 7/10 to 8/10 and physical examination findings were consistent with previous exams.  (Tr. 494-95.)  Dr. Matos also examined Plaintiff on September 18, 2017, and his findings were consistent with previous treatment notes.  (Tr. 490-93.)

On October 4, 2017, Plaintiff presented for follow-up and for a lumbar epidural steroid injection under fluoroscopy at L5-S1, which was administered by Dr. Matos.  (Tr. 484-89.)  Dr. Matos noted Plaintiff had a history of low back pain radiating to lower extremities, correlating with lumbar radiculopathy, and had failed conservative therapy.  (Tr. 484.)  The procedure resulted in "immediate complete relief of target pain."  (*Id.*)  Plaintiff followed up on October 16, 2017 and noted over 80% improvement from the lumbar epidural steroid injection, but still reported pain ranging in severity from 6/10 to 8/10.  (Tr. 480.)  On November 21, 2017, Plaintiff reported pain ranging from 4/10 to 8/10.  (Tr. 476.)  Dr. Andrawis also noted that Dr. Hardin ordered physical therapy for Plaintiff's bilateral upper extremity pain to begin the following month.  (Tr. 478.)

## 2.    MRI Results[6]

_____

[6] The medical records predating the alleged disability onset date are not included in this section.  However, the Court notes that Plaintiff had a lumbar spine MRI on June 7, 2013 which revealed, in part, the following:

> IMPRESSION:
> 1.      Left paracentral herniation to the T11-12 disc.
> 2.      Lumbar spondylotic changes involving predominantly L3-4, L4-5, L5-S1 levels with protruding discs at these levels as described above.

(Tr. 297.)

On June 21, 2013, an MRI of the thoracic spine without contrast also revealed the following:

> FINDINGS:  . . . Intervertebral discs demonstrate mild disc desiccation. There is also mild loss of disc space height predominantly involving the lower thoracic segments.  There is a desiccated herniated T11-12 disc. This herniates in a left paracentral location moderately effacing the left anterior aspect of the thecal sac.  Small left-sided disc protrusions are seen at the T7-8, T8-9, T9-10.  There is also asymmetric spurring along the medial aspect of the articular facet on the left at T10-11 which effaces the left posterolateral aspect of the thecal sac to a mild degree.  The spinal cord is of normal course and caliber and signal intensity[.]  [T]here is no evidence of any central spinal stenosis.  No neural foraminal stenosis is seen.
>
> IMPRESSION:  Thoracic spondylotic change with the significant abnormality being present at T11-12 there is a left paracentral disc herniation.

(Tr. 298.)

An MRI of the cervical spine on December 15, 2014 revealed the following:

> IMPRESSION:
> 1.        At C5-6 and C6-7, there are small anterior osteophytes consistent with mild spondylosis.  At C5-6, there is marginal disc narrowing.
> 2.        At C5-6, there is a right central disc herniation superimposed on disc bulging.  The herniation impresses the anterior margin of the thecal sac.  AP diameter of the canal is 8.5 mm and there is mild to moderate central canal stenosis.  There is uncovertebral spurring with mild to moderate left foraminal stenosis.  Key image 1 is a sagittal T2 image to the right of midline.  The arrow is pointing to the C5-6 disc herniation.  Key image 2 is an axial T-2 image at C5-6.  The arrow is pointing to the right central disc herniation.
> 3.        At C6-7, there is disc bulging impressing the anterior margin of the thecal sac.  AP diameter of the canal is 9 mm and there is mild central canal stenosis.  There are uncovertebral spurs and there is moderate left and mild right foraminal stenosis.

(Tr. 303.)

On January 21, 2016, Plaintiff underwent an MRI of the cervical, thoracic

and lumbar spine, which showed:

> Cervical spine:  The patient status post cervical arthrodesis at C5,
> C6 and C7.

> There [is] shallow posterior disc osteophyte complex at C3-4, C4-5,
> and C5-6.  The central spinal canal is widely patent with no evidence
> of stenosis or cord impingement.  No focal, acute disc herniation is
> identified.

> The incidentally visualized intracranial contents, pons, medulla,
> cervicomedullary junction and skull base are normal . . . .  The
> cervical and thoracic spinal cord are normal in signal . . . .

> Thoracic Spine:
> There is a shallow, annular disc bulge at T11-12 which causes no
> central canal stenosis or cord impingement.

> The thoracic vertebral bodies are normal in height, alignment and
> morphology and demonstrate normal cortical marrow signal with no
> evidence of contusion, fracture or significant, focal marrow-replacing
> process such as infection or neoplasm.
> Thoracic foramina are patent at all levels.

> Lumbar spine:

> The lumbar vertebral bodies are normal in height, alignment and
> morphology and demonstrate normal cortical and marrow signal . . . .

> Degenerative changes are identified as follows:

> L2-3:  There is a shallow, stable annular disc bulge which combines
> with hypertrophic arthropathy [sic] produce mild central canal
> stenosis.

> L3-4:  There is a shallow, stable annular disc bulge which combines
> with hypertrophic arthropathy [sic] produce mild to moderate central
> canal stenosis.

> L4-5:  There is a shallow, central disc protrusion which produces no
> central canal or foraminal narrowing.

The lumbar foramina are patent at all levels.

Incidental note is made of a posterior, probable right ovarian cyst identified along the right posterolateral margin of the uterus, partially imaged in the field-of-view.

(Tr. 399-400.)  The impression was:

1. In the cervical spine, there are findings of prior C5-7 arthrodesis. No central canal stenosis or cord signal abnormality is seen.
2. In the thoracic spine, there is a stable disc protrusion at T11-12, which causes mild central narrowing, unchanged from 6/21/2013.
3. In the lumbar spine, there are multilevel findings of chronic spondylosis which are largely stable when compared to prior exam dated 6/7/2013.
4. Probable ovarian cyst in the pelvis, incompletely imaged.  Pelvic sonogram is recommended for further evaluation.

(Tr. 400.)

Plaintiff's records from Premier, dated September 5, 2017, indicate that she underwent another MRI on August 31, 2017 at Ed Fraser Memorial, which showed "[m]ultilevel minimal discogenic disease" and "[n]o significant canal stenosis."  (Tr. 494-96.)  While the MRI report is discussed in these treatment notes, the diagnostic imaging results are not in the record.  (Tr. 494.)

### 3.    Dr. Victor Micolucci

On February 29, 2016, Dr. Victor Micolucci, with Oceanway Medical Center, completed a Range of Motion ("ROM") Questionnaire.[7]  (Tr. 383-86.)  In his ROM Questionnaire, Dr. Micolucci noted abnormal range of motion findings in

_____

[7] Although the ROM Questionnaire is the only medical record from Dr. Micolucci, medical records from Coastal list Victor Micolucci as Plaintiff's PCP (primary care physician/provider) and referring source.  (*See* Tr. 319-55.)

23

Plaintiff's neck, back, and shoulders and with sitting and supine straight leg

raising.  (Tr. 383.)  The Questionnaire also noted normal range of motion in

Plaintiff's elbows, forearms, wrists, hips, knees, ankles, and feet.  (Tr. 384.)  Dr.

Micolucci noted normal active range of motion in Plaintiff's hands and fingers and

normal grip and pinch.  (Tr. 385.)  Dr. Micolucci described Plaintiff's gait as

antalgic, forced, and waddling and noted that she placed most of her weight on

her right leg.  (*Id.*)  In describing "fine and gross coordination of affected

extremities," Dr. Micolucci further noted: "Decreased ability to reach and

pull/push.  Normal grasp [and] pinch.  Difficulty rolling over and sitting due to

pain.  Inability to keep neck flexed [more than] one minute due to pain."  (*Id.*)  He

also provided the following as examples of Plaintiff's functional use of the

impaired extremities: "Inability to flex neck [greater than] one minute during

writing/paperwork.  Difficulty bending to tie shoelace[s] due to limited [range of

motion].  Can feed herself and pick up objects.  Difficulty getting dressed due to

bending and putting shirt on over her head."  (*Id.*)

### 4.    State Agency Non-Examining Doctors

On March 2, 2016, based on a review of the records available as of that

date, the State agency non-examining consultant, Arthur Lesesne, M.D.,

completed an RFC Assessment of Plaintiff's abilities.  (Tr. 74-76.)  Dr. Lesesne

opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten

pounds frequently; could sit for about six hours and stand and/or walk for about

six hours in an eight-hour workday; could push and/or pull at an unlimited level

"other than shown, for lift and/or carry; could frequently balance, stoop, kneel, crouch, and crawl and occasionally climb ramps, stairs, ladders, ropes, or scaffolds; and should avoid concentrated exposure to extreme cold and hazards. (Tr. 74-75.)  Further, Dr. Lesesne opined that Plaintiff should be limited to reaching left overhead and right overhead and explained that "overhead[] reaching [is] limited to occasional due to ACDF."  (Tr. 75.)

On May 13, 2016, at the reconsideration level, the State agency non-examining medical consultant, Antonio Medina, M.D., concurred with Dr. Lesesne's proposed RFC.  (Tr. 86.)  Dr. Medina noted that at reconsideration, Plaintiff also complained of GERD, shortness of breath, and bilateral hand pain, but determined that "[n]one of these additional allegations [were] supported by the evidence."  (*Id.*)  Dr. Medina also referred to the ROM Questionnaire from Dr. Micolucci but noted that he was unsure whether Dr. Micolucci was a treating source and that he was "unable to determine what [Dr. Micolucci] [was] saying in the absence of medical records."  (*Id.*)

## C. The ALJ's Decision

At step two of the sequential evaluation process,[8] the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine, status-post anterior discectomy and fusion on March 19, 2015;

---

[8] The Commissioner employs a five-step process in determining disability.  *See* 20 C.F.R. § 404.1520(a)(4).

degenerative disc disease of the lumbar spine; and obesity (20 C.F.R. §

404.1520(c)).  (Tr. 23.)  The ALJ also found that Plaintiff had the non-severe

impairments of COPD and anxiety, and the non-medically determinable

impairments of gastroesophageal reflux disorder ("GERD") and bilateral hand

pain.  (Tr. 23-24.)  Further, the ALJ found that Plaintiff had the RFC to perform

light work[9] with the following limitations:

> [O]verhead reaching with the bilateral upper extremities is limited to
> occasional; claimant may never climb ladders, ropes, or scaffolds
> and may only occasionally climb ramps/stairs; balancing, stooping,
> kneeling, crouching, and crawling are limited to frequent; claimant is
> limited to frequent exposure to extreme cold and may never work at
> unprotected heights.

(Tr. 25.)

In making this finding, the ALJ discussed, *inter alia*, Plaintiff's subjective

complaints, the objective medical findings, the treatment and examining records,

and the opinion evidence.  (Tr. 25-28.)  The ALJ specifically discussed the

evidence as follows:

> Claimant alleges an onset date of March 4, 2015.  Exhibit 1F
> contains a radiology report from 2013 showing a disc herniation at
> T11-12 [as] well as spondylotic changes at L3-5 and L5-S1.  Exhibit
> 1F also contains an orthopedic note from June 2015 in which [the]
> claimant's doctor warned her to stop filling opioid prescriptions in
> both Florida and Georgia at the same time.  *Id.* at 3.  Exhibit 2F
> contains a radiology report from December 2014 showing mild
> spondylosis at C5-7 as well as disc herniation/disc bulge at C5-6.

---

[9] By definition, light work involves lifting no more than twenty pounds at a time
with frequent lifting or carrying of objects weighing up to ten pounds; it requires a good
deal of walking, standing, or sitting most of the time with some pushing and pulling of
arm or leg controls.  20 C.F.R. § 404.1567(b); SSR 83-10.

(Tr. 25.)  The ALJ then referred to Exhibit 3F, containing neurosurgery notes, recommending a cervical discectomy and fusing at C5-C7, which Plaintiff underwent on March 19, 2015.  (*Id.*)  The ALJ then referred to a follow-up note from Plaintiff's neurosurgeon dated April 6, 2015 indicating that "[X]-rays of the cervical spine 'reveal adequate placement of the hardware with no loosening or shadows noted'" and that she appeared to be doing well, would maintain a ten pound lifting restriction for six weeks, and would return to the clinic for a 90-day postoperative visit.  (*Id.*)  However, the ALJ stated that "from what [he] could see, claimant never returned for her 90-day postoperative visit."  (*Id.*)

The ALJ continued as follows:

Claimant began treating with a Florida pain clinic in late 2014.  A note dated June 2015 revealed that claimant was on oxycodone and hydrocodone and was getting it from two different states.  According to the most recent note dated July 2015, claimant was complaining of low back pain.  Physical exam revealed negative straight leg raising with decreased sensation in the lower extremities.  Claimant was diagnosed with lumbosacral radiculitis and given refills for narcotics.

Exhibit[s] 5F, 6F, and 8F contain treatment notes from Kaiser. According to what appears to be a pain treatment intake note at Kaiser dated November 2015, physical exam was notable for decreased cervical and lumbar range of motion secondary to muscle tenderness – however, other testing, including straight leg raising, was normal.  Claimant had full motor/grip strength in her extremities and she had full range of motion in her bilateral upper extremities. Claimant also had normal gait and station.  Claimant was provided a "courtesy" prescription of hydrocodone given the fact that she was already on it from another provider.  Claimant was instructed to complete 2-3 months of physical therapy and then follow up with him [sic].  When claimant followed-up in February 2016, she indicated that she had not participated in physical therapy because she said it was too expensive.  Exhibits 8F at 28.  Instead, claimant preferred to

treat with narcotics.  Interestingly, physical exam was completely unremarkable other than for reported pain with bilateral lumbar facet loading.  Claimant was again instructed to participate in physical therapy.  Claimant declined, and I see no further treatment records from this provider.

(Tr. 26.)

In discounting the opinion of Dr. Micolucci, the ALJ stated as follows:

Exhibit 7F contains a medical source statement from a treating Florida pain doctor dated February 2016.  I give little weight to this medical source statement because the opinions expressed therein are not supported by the medical evidence of record.  For example, this pain doctor states that claimant has "antalgic gait; forced gait; waddling gait" – yet multiple physical exams performed at Kaiser showed completely normal gait.  See Exhibit 8F.  Similarly, this pain doctor states that claimant has decreased grip and pinch strength – yet multiple exams at Kaiser showed normal grip and pinch strength.  I am thus left with the firm impression that this pain doctor is not an impartial witness.

(*Id.*)  The ALJ then addressed the evidence from Dopson Family Care in Florida, noting normal findings as well as "tenderness with limited range of motion of the neck and some left knee pain" on April 4, 2017, when claimant established care.  (*Id.*)  According to the ALJ, Plaintiff was "once again prescribed physical therapy and a back brace" but "refused to participate in physical therapy."  (*Id.*)  The ALJ then stated, "In any event, <u>by the next visit dated April 21, 2017, claimant had normal range of motion of the neck and no tenderness</u>.  *Id.* at 8.  Notes dated May 3, 2017 and May 25, 2017 read similarly.  In fact, the note dated May 25 indicates that claimant was no longer having prominent neck pain or lower extremity pain."  (*Id.* (emphasis in the original).)

The ALJ then stated:

28

At a doctor's visit on May 25, 2017, claimant alleged anxiety for the first time and asked for some Xanax.[10]  Exhibit 10F at 18.  Claimant was given a diagnosis of mood swings and given Xanax as requested.  Thus, claimant was now on chronic opioids and Xanax, which is contraindicated by the FDA.  According to a note dated October 2017 (shortly before claimant's disability hearing) she requested a ventolin inhaler for [COPD] and 90 additional Xanax pills.

(Tr. 27.)  In according little weight to the opinion of Dr. Hardin, the ALJ reasoned

as follows:

According to another note[,] dated October 2017, claimant was asking for disability paperwork and complaining of musculoskeletal pain.  Suddenly, [the] claimant had sensory loss in the upper extremity and markedly decreased grip strength.  Lumbar flexion was 80 degrees without left S1 and L5-S1 pain.  The doctor then wrote, "She cannot engage in employment as even clerical job description requires frequent stretching breaks, daily analgesic and muscle relaxant support."  *Id.* at 27.  I give little weight to this medical source statement because a primary care physician is not an expert in functional capacities, or a vocational expert.  Thus, any opinion from this doctor regarding what, if any, jobs [the] claimant is able to perform is an opinion lacking in foundation.  Additionally, [the] claimant's reported symptoms/exam result[s] at this visit are inconsistent with symptoms/exam results reported just a few weeks earlier.  Thus, I am left with the impression the claimant's attorney and impending disability hearing were playing a role here.  Similarly, according to a note dated November 2017, claimant reported that she was unable to grip even a coffee cup.  Exhibit 10F at 30.  [The] [c]laimant had normal range of motion of the neck but alleged tenderness.  Id. at 32.

(Tr. 27.)

---

[10] This characterization of the evidence is not entirely accurate.  The note from Dr. Hardin, Plaintiff's primary care physician, dated May 25, 2017 actually stated that Plaintiff was "requesting to discuss anxiety issues[.]  [S]he states she has been previously diagnosed with anxiety issues and her symptoms are becoming worse lately[.]"  (Tr. 448.)

The ALJ then addressed "pain clinic notes," presumably from Premier, and stated that "[a]ccording to a note dated April 2017, claimant reported that she had once again moved back to Florida and was seeking narcotics." (*Id.*)  The ALJ then stated that, according to a note dated October 2017, Plaintiff "reported that a recent epidural steroid injection had helped, but that she still had neck pain radiating down both arms and legs." (*Id.*)  The ALJ also noted that the most recent note (presumably from Premier), dated November 2017, indicated that Plaintiff continued to complain of chronic pain, but a "[p]hysical exam revealed normal back exam (other than some tenderness), normal gait/station with full motor strength in all extremities, and decreased range of motion of the neck with tenderness" and that Plaintiff " was given refills of chronic opioids." (*Id.*)

The ALJ then accorded great weight to the May 2016 opinion of Dr. Medina, a State agency consultant, because "[he] is a medical doctor with program knowledge whose opinions are well-reasoned (see Exhibit 3A) and consistent with the medical evidence of record." (*Id.*)  The ALJ also adopted Dr. Medina's opinions as to Plaintiff's RFC capacity, but "subject to the limitation that claimant must avoid entirely ladders, ropes, and scaffolds (out of an abundance of caution)." (*Id.*)

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms were not "entirely consistent with the medical evidence and other

evidence in the record."  (Tr. 27-28.)  The ALJ explained:

> Claimant alleges disability primarily for musculoskeletal reasons—
> yet her course of treatment is inconsistent with disability.  For
> starters, claimant never followed up with her neurosurgeon at the 90-
> day mark as instructed.  Instead, she opted to go straight to the pain
> clinic to secure more opioids.  Even the pain doctor expressed
> concern regarding claimant's behavior, informing her that she had to
> stop filling opioids across state lines.  Additionally, multiple doctors
> told claimant that she needed to complete a course of physical
> therapy.  Claimant opted not to complete any physical therapy,
> instead opting for more opioids and, eventually Xanax as well.
> Thus, claimant's non-compliance, coupled with her drug seeking
> behavior, call into question whether her symptoms are as disabling
> as alleged.  Additionally, physical exams of claimant's neck have
> sometimes been completely normal or close to normal.  It also does
> little to help claimant's case that she suddenly alleged anxiety a
> couple of months before her disability hearing and asked for Xanax
> by name, while at the same time indicating she did not want an
> SSRI, which the FDA recommends as the primary line of treatment
> for such condition.  And I note that mental status exams have almost
> exclusively been completely unremarkable.  I have considered the
> [third]-party function report provided by claimant's husband who says
> he spends "24 hours a day 7 days a week" with the claimant—which
> I find interesting, given that he reports living in Lilburn, Georgia at
> the same time his wife was going to pain clinics in Florida.  In any
> event, I find the medical evidence of record to be the most objective
> and informative evidence regarding [the] claimant's abilities in this
> case.

(Tr. 28.)

Then, at step four, the ALJ determined that Plaintiff was capable of

performing her past relevant work as a nurse supervisor, DOT # 075.167-010,

light work with a Specific Vocational Preparation ("SVP") of 7, and as a hospital

admitting clerk, DOT # 205.362-018, sedentary work with an SVP of 4.  (Tr. 28.)

The ALJ found that Plaintiff could perform these jobs both as "actually and

generally performed."  (*Id.*)  Alternatively, the ALJ proceeded to step five and

31

after considering Plaintiff's age, education, work experience, and RFC, he also determined that there were jobs existing in significant numbers in the national economy that Plaintiff could perform.  (Tr. 29.)  In making this determination, and in assessing "the extent to which these limitations erode[d] the unskilled light occupational base," the ALJ relied on the testimony of the VE who testified that Plaintiff would be able to perform the jobs of phlebotomist, referral clerk, data clerk, marker, and cashier II.  (*Id.*)  Thus, the ALJ concluded that Plaintiff was not disabled from March 4, 2015 through the date of the decision.  (*Id.*)

### D.   Analysis

The Court agrees with Plaintiff that the ALJ improperly evaluated the opinion evidence.  The ALJ gave great weight to Dr. Medina's non-examining opinion because he was "a medical doctor with program knowledge whose opinions are well-reasoned . . . and consistent with the medical evidence of record."  (Tr. 27.)  However, in May of 2016 when Dr. Medina issued his opinion based on a review of an incomplete record, he did not have the benefit of reviewing and considering any of the subsequent treatment records and examination findings, including Dr. Hardin's opinion from November 17, 2017, which corroborated Plaintiff's complaints of pain and the limiting effects of her symptoms.

Defendant argues that the ALJ's decision to give Dr. Micolucci's opinion little weight is supported by substantial evidence and the record as a whole and any discrepancies in the ALJ's interpretation or mischaracterization of the

evidence were harmless error.  (Doc. 21 at 10-13.)  Defendant also argues that

the ALJ did not err in giving little weight to Dr. Hardin's opinion because it was a

vocational opinion, which is an issue reserved for the ALJ.  (Doc. 21 at 14-15.)

Defendant also contends that "while treatment notes from when Dr. Hardin

issued his opinion document some limited range of motion in the neck and

decreased grip strength in the right hand, those findings are inconsistent with the

majority of Dr. Hardin's treatment records."  (*Id.* at 15.)  However, the Court notes

that the ALJ's reasons for rejecting the treating and examining opinions of Dr.

Hardin, while according great weight to the non-examining opinion of record, are

not supported by substantial evidence.[11]

    In discrediting the opinions of Dr. Hardin, the ALJ relied on unremarkable

examination findings, such as normal gait, normal extremity strength and lack of

neurological deficits, but the ALJ essentially ignored positive examination

findings, such as antalgic gait; painful and reduced cervical and lumbosacral

range of motion; hand pain, including left trigger thumb and right trigger finger;

and tendonitis affecting the upper extremities (elbows/forearm/hands) bilaterally,

requiring injection therapy.  (Tr. 372, 381, 453-55, 463, 465, 477-78.)   Also,

---

[11] The undersigned finds that the ALJ's reasons for discounting the statement of
Dr. Micolucci are supported by substantial evidence.  Although Plaintiff argues that the
ALJ erred in giving little weight to the medical source statement of Dr. Micolucci, and the
undersigned notes that the ALJ misinterpreted Dr. Micolucci's findings with regard to
Plaintiff's grip and pinch,  the undersigned finds that such error was harmless.
Moreover, the record does not contain any other examining reports from Dr. Micolucci to
establish his treating relationship to Plaintiff or his area of specialty, other than the
references to Dr. Micolucci as Plaintiff's primary care physician and referring doctor in
the treatment records from Coastal.  (*See* Tr. 319-55.)

while the ALJ rejects Dr. Hardin's opinions because the "claimant's reported symptoms/exam results" were inconsistent with "symptoms/exam results reported just a few weeks earlier," the ALJ fails to address or acknowledge the relevant medical evidence and records of concurrent treatment by Plaintiff's treating physicians at Premier, which provided support for her complaints and symptoms as well as Dr. Hardin's opinions.  (Tr. 476-512.)

Moreover, the examination findings were not as unremarkable as the ALJ seems to suggest.  The examinations for the relevant period often revealed, *inter alia*, limited cervical and lumbar mobility with flexion, extension and side-bending; tenderness in the paraspinal musculature to palpitation; cervical and lumbar facet column tenderness; trigger points in the upper and lower extremities; bilateral hand pain, including left trigger thumb and right trigger finger; positive facet loading tests of the cervical and lumbar spine; spasm and tenderness of the paravertebral muscles in the cervical, thoracic, and lumbar regions; and positive Spurling's tests.  (*See, e.g.*, Tr. 364, 367, 372, 381, 395, 415, 436-37, 441, 454, 460, 463, 465, 487, 491, 495, 499, 502, 505, 510.)  Also, Plaintiff's moderate to severe pain was well-documented and confirmed by the physical examinations in the record.  (*See* Tr. 310, 312, 319, 321, 326, 328, 363, 372, 486, 490, 494, 498, 501, 504, 507, 509.)

Further, the abnormal MRIs were consistent with the examination findings and Plaintiff's reported symptoms.  (*See* Tr. 297-98, 303, 399-400, 494-95.)  Those results, along with the physical examination findings and Plaintiff's course

34

of treatment, supported Plaintiff's complaints of disabling symptoms.  Plaintiff's treatment included medications, physical therapy, osteopathic manipulative treatment, bone stimulation and TENS (transcutaneous electrical nerve stimulation) treatment, and a variety of injections.  (Tr. 381, 453-55, 460, 463, 465, 484-89, 502-03; *see also* Tr. 363 (noting Plaintiff's treatment included ACDF surgery in March 2015, multiple epidural steroid injections, trigger point injections, lumbar RFL (radiofrequency lesioning), physical therapy, and electrical stimulation).)  Moreover, after failing conservative treatment, including physical therapy, Plaintiff underwent ACDF of the cervical spine.  (*See* Tr. 310-12, 331, 338-39; *see also* Tr. 484 (noting Plaintiff was administered a lumbar epidural steroid injection on October 4, 2017 after failing conservative therapy).)

Based on the foregoing, the Court cannot conclude that the ALJ's reasons for discounting the opinion of Dr. Hardin, while according great weight to the opinion of Dr. Medina, were supported by substantial evidence in the record.  It also appears that the ALJ ignored Dr. Hardin's opinion that Plaintiff was limited in her ability to lift, pull, and push, was unable to lift over fifteen pounds repetitively, and could not "remain on her feet for over 30 minutes without increasing low back pain and lower extremity radicular symptom progression."  (Tr. 459.)

Considering that Dr. Medina did not have an opportunity to review Dr. Hardin's examination findings and opinions, or the other medical evidence dated after May of 2016, the Court can only speculate whether Dr. Medina would have reached the same conclusions if he had been presented with the complete

record.  Considering this uncertainty and the lack of substantial evidence to support the ALJ's reasons for discounting Dr. Hardin's opinions, the Court concludes that under the circumstances here, the case should be remanded for reconsideration of the opinion evidence of record.[12]

In addition, Plaintiff argues that the ALJ's apparent prejudice or bias warrant the case to be remanded to another ALJ.  (Doc. 20 at 33.)  Plaintiff claims that she satisfied her burden of rebutting the presumption that the ALJ was unbiased.  (*Id.*)  Plaintiff argues:

> On more than one occasion, the ALJ misrepresented or mischaracterized the evidence in this case.  He did so for the purposes of rejecting a disabling opinion of at least one treating source and for purposes of impugning Ms. Bommicino's character.  Moreover, his decision evidences his hostility towards Ms. Bommicino specifically and a greater hostility toward pain management treatment.  For instance, he repeatedly refers to her physicians as "pain doctors."

(*Id.*)

"A claimant is entitled to a hearing that is both full and fair."  *Miles v. Charter*, 84 F.3d 1397, 1400 (11th Cir. 1996) (per curiam).  In *Miles*, the court

---

[12] Because the Court reverses based on the second issue raised by Plaintiff, the Court does not fully analyze the remaining issue raised on appeal.  Nevertheless, the Court finds that the ALJ also committed reversible error in discounting her subjective complaints based on her purported "non-compliance" with recommendations that she participate in physical therapy (Tr. 28) in light of her inability to afford physical therapy.  There is evidence in the record that Plaintiff's insurance coverage and lack of funds affected her ability to receive treatment.  For example, a note from Dr. Lopez at Coastal, dated July 22, 2015, indicated that he "had ordered MRI LSP due to [a] fall and worsening LE pain.  It was denied by insurance and know [sic] she is self[-]pay due to apparent insurance issues."  (*See* Tr. 319; *see also* Tr. 325 ("LSO [lumbar-sacral orthosis/back brace] previously requested.  Patient had significant deductible.  We will re-submit request for [authorization] for LSO.").)

stated:

> The ALJ plays a crucial role in the disability review process.  Not
> only is he duty-bound to develop a full and fair record, he must
> carefully weigh the evidence, giving individualized consideration to
> each claim that comes before him.  Because of the deferential
> standard of review applied to his decision-making, the ALJ's
> resolution will usually be the final word on a claimant's entitlement to
> benefits.  The impartiality of the ALJ is thus integral to the integrity of
> the system.

*Id.* at 1401.  Nevertheless, the undersigned finds that this was the first time the

ALJ heard this case and remand to a new ALJ is not warranted at this time.

Accordingly, it is **ORDERED**:

1.      The Commissioner's decision is **REVERSED and REMANDED**

pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to

conduct the five-step sequential evaluation process in light of all the evidence,

including the opinion evidence from treating, examining, and non-examining

sources, and conduct any further proceedings deemed appropriate.

2.      The Clerk of Court is directed to enter judgment accordingly,

terminate any pending motions, and close the file.

3.      In the event that benefits are awarded on remand, any § 406(b) or §

1383(d)(2) fee application shall be filed within the parameters set forth by the

Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42*

*U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov.

13, 2012).  This Order does not extend the time limits for filing a motion for

attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** in Jacksonville, Florida, on September 23, 2020.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record